UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BROOKS MANUFACTURING COMPANY, | NO. |
| Plaintiff, | COMPLAINT FOR DECLARATORY JUDGMENT |
| v. | |
| UNITED STATES FIRE INSURANCE COMPANY, | |
| Defendant. | |

Brooks Manufacturing Company alleges as follows:

## I. INTRODUCTION

1.1. This is an action for declaratory judgment arising out of United States Fire Insurance Company's ("U.S. Fire's") refusal to acknowledge the existence and terms of an umbrella liability insurance policy DCL 72630 issued to Brooks Manufacturing Co. for the policy period July 15, 1971 to January 1, 1975.

1.2. Brooks Manufacturing Co. ("Brooks Manufacturing") faces environmental property damage liability under Washington's Model Toxics Control Act (MTCA) due to the releases of hazardous substances that allegedly occurred during Brooks Manufacturing's former

COMPLAINT FOR DECLARATORY JUDGMENT - 1
No.

GORDON TILDEN THOMAS CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

tenancy at the R.G. Haley site in Bellingham, WA.  The R.G. Haley Site is now owned by the City of Bellingham.

1.3.   Washington's Department of Ecology has named Brooks Manufacturing a "potentially liable person" ("PLP") under MTCA for remediation expenses at the R.G. Haley Site.

1.4.   Now exposed to significant liability at the R.G. Haley Site, and facing a substantial likelihood that the limits of the primary liability policy(ies) underlying the U.S. Fire policy will be exhausted, Brooks Manufacturing brings this declaratory judgment action to establish the existence and terms of the umbrella liability coverage it purchased from U.S. Fire.

## II.  PARTIES

2.1.   **Brooks Manufacturing Co.**   Plaintiff Brooks Manufacturing Co. ("Brooks Manufacturing") is a corporation organized under the laws of the State of Washington, with its principal place of business in Bellingham, Washington.  Brooks Manufacturing is the successor-in-interest to Frank Brooks Manufacturing Company.

2.2.   **United States Fire Insurance Company.**   Upon information and belief, Defendant United States Fire Insurance Company ("U.S. Fire") is a New Jersey corporation, organized and incorporated under the laws of Delaware.  During all times relevant to this Complaint, U.S. Fire transacted business in the State of Washington.

## III.  JURISDICTION AND VENUE

3.1.   **Personal Jurisdiction.**   This Court has personal jurisdiction over the parties.

3.2.   **Subject Matter Jurisdiction.**   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332.  There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

COMPLAINT FOR DECLARATORY JUDGMENT - 2
No.

GORDON TILDEN THOMAS CORDELL | 600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

3.3.     **Venue.**  Venue is proper pursuant to 28 U.S.C. § 1391 because U.S. Fire issued the insurance policy in the Western District of Washington; alternatively, U.S. Fire is subject to personal jurisdiction in the state of Washington.

## IV.  THE POLICY AT ISSUE

**A.     Brooks Manufacturing's Coverage from U.S. Fire**

4.1.     U.S. Fire, in consideration of premiums paid by Brooks Manufacturing, sold an umbrella liability policy (the "Policy") to Brooks Manufacturing under its former name, Frank Brooks Manufacturing (hereinafter "Brooks Manufacturing").  The policy number was DCL 72630.  The policy period was July 1, 1971 through January 1, 1975.

4.2.     U.S. Fire denies it issued the policy.

4.3.     Evidence of the Policy is substantial.  Records provided by Brook Manufacturing's former insurance broker, Marsh & McLennan ("Marsh"), the testimony of Marsh's former employee Joanne Sebring, and Brook Manufacturing's consistent pattern of purchasing excess and umbrella policies with per occurrence limits of $2 million during the 1970s all show that Brooks Manufacturing purchased policy DCL 72630.

4.4.     In August of 1994, John Ferlin, the current CEO of Brooks Manufacturing, contacted Marsh and requested all records related to liability insurance policies purchased by Brooks Manufacturing.  In response, Mr. Ferlin received copies of the index cards maintained and used by Marsh to track the insurance coverage obtained for each client.

4.5.     Four index cards provided by Marsh show that U.S. Fire issued Brooks Manufacturing an umbrella liability policy.  Copies of the index cards are attached as **Exhibit A.**

4.5     The earliest index card, dated August 6, 1971, indicates that Brooks Manufacturing purchased umbrella liability policy DCL 72630 from U.S. Fire, with a policy

COMPLAINT FOR DECLARATORY JUDGMENT - 3
No.

GORDON TILDEN THOMAS CORDELL | 600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

period from July 15, 1971 to July 15, 1974.  Brooks was charged $700 for the first year of coverage, and a handwritten notation, "R'd [renewed] same #," indicates it was renewed the next year under the same number.

4.6     The next index card, dated June 19, 1972, covers the billing period from July 15, 1972 to July 15, 1973.  It indicates the Brooks Manufacturing paid U.S. Fire a premium of $887 to maintain coverage for the 1972 – 1973 Policy year.

4.7     The third index card, dated May 10, 1973, is the invoice for the third year of coverage.  It confirms that Brooks Manufacturing was still insured under U.S. Fire policy DCL 726230, and that the premium for the final year was $887.  The card has a handwritten notation indicating the policy period was extended until January 1, 1975.

4.8     The fourth index card, dated August 24, 1973, confirms the handwritten notation on the third card.  It is an invoice for the policy period of July 15, 1974 through January 1, 1975.  It includes the same U.S. Fire policy number and indicates that Brooks Manufacturing paid a premium of $413 to extend the policy period an additional six months to January 1, 1975.

4.9     Marsh's former employee, Joanne Sebring, was responsible for maintaining Marsh's index system.  Mrs. Sebring completed a 34-year career at Marsh, working there first as a clerk from 1960 to 1965, and then for another 29 years from 1967 to 1996.  Mrs. Sebring's main responsibility was to create and maintain the index cards, including the four index cards that reflected the umbrella policy that Brooks Manufacturing purchased from U.S. Fire.

4.6.    When Mr. Ferlin contacted Marsh in August of 1994 to request Marsh's records of Brooks Manufacturing's policies, Mrs. Sebring fielded the request.  Mrs. Sebring easily located the index cards because they were filed alphabetically by insured.

COMPLAINT FOR DECLARATORY JUDGMENT - 4
No.

GORDON TILDEN THOMAS CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

4.7. Mrs. Sebring testified in a deposition that she always was careful to record policy information accurately on the index cards, and that the information on the index cards indicated that Brooks Manufacturing had purchased a three-year umbrella liability policy from U.S. Fire expiring on July 15, 1974, and then extended for an additional six months to January 1, 1975.

4.8. Marsh also provided Brooks Manufacturing the index cards indicating the coverage purchased by Brooks Manufacturing after July 1, 1975. The information on the cards matches the policies in Brooks Manufacturing's possession, providing further evidence that the cards created and maintained by Marsh accurately reflect the insurance purchased by Brooks Manufacturing.

4.9. Every year between 1971 and at least 1986, Brooks purchased umbrella liability policies with a $2 million per occurrence limit applicable to property damage liability.

4.10. The U.S. Fire Policy has a $2 million per occurrence limit applicable to property damage liability.

4.11. Brooks Manufacturing has asked U.S. Fire numerous times for copies of the Policy.

4.12. U.S. Fire has not provided a copy of the Policy.

4.13. U.S. Fire provided some insurance policy forms to Brooks Manufacturing, but, contrary to section 384-30-920 of the Washington Administrative Code, it has not stated which of the potentially applicable forms is most likely to have been issued to Brooks Manufacturing and why.

4.14. Contrary to section 384-30-920 of the Washington Administrative Code, U.S. Fire has repeatedly refused to acknowledge that it more likely than not issued the Policy to Brooks Manufacturing.

COMPLAINT FOR DECLARATORY JUDGMENT - 5
No.

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

## V.  THE UNDERLYING LIABILITY

**A.  Brooks Manufacturing's liability for environmental property damage at the R.G. Haley Site.**

5.1. Brooks Manufacturing faces liability for property damage allegedly sustained to the soil, groundwater, surface water, and natural resources at and in connection with the R.G. Haley Site ("Site") in Bellingham, Washington.  The R.G. Haley Site is the subject of an environmental cleanup action ordered by the Washington Department of Ecology ("Ecology").

5.2. Brooks leased land within the Site continuously from 1965 until 1985.

5.3. On March 17, 2015, the City of Bellingham (the "City") asked Ecology to name Brooks Manufacturing as a PLP under Washington's Model Toxics Control Act for the cleanup action at the Site.  The City alleges that storage of treated lumber on the lands leased by Brooks Manufacturing during the time of Brooks Manufacturing's lease contributed to contamination at the site.  The City alleges that Brooks Manufacturing knew the treated lumber was releasing pentachlorophenol into the Site, and that the releases occurred for at least 20 years.  The City also alleges that Brooks Manufacturing disposed of asphalt and pulp waste and allowed others to dispose of oil on the leased lands.

5.4. On April 23, 2015, Ecology notified Brooks Manufacturing that it was a proposed PLP for the release of hazardous substances at the Site.  Over Brooks Manufacturing's vigorous objection, Ecology confirmed Brooks Manufacturing's status as a PLP July 2015, determining that credible evidence existed to name Brooks Manufacturing a PLP.  According to Ecology, "During Brooks tenancy, correspondence indicates they filled and dumped, or allowed others to fill and dump, hazardous substances, including oil, in violation of lease terms.  Treated lumber was also allowed to be stored on their leased land."

COMPLAINT FOR DECLARATORY JUDGMENT - 6
No.

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

5.5. Brooks Manufacturing is still a PLP at the Site.

5.6. Brooks Manufacturing is one of just four PLPs at the Site.

5.7. The City has completed a remedial investigation and feasibility study (RI/FS) for the Site and a Cleanup Action Plan. The estimated cost for the remedy recommended in the Cleanup Action Plan is $15,720,000.

5.8. Brooks has already incurred, and will continue to incur, losses and expenses at the Site in the form of defense expenses.

## B.     Trigger of Excess Coverage

5.9. Brooks Manufacturing's liability for the Site arises out of alleged occurrences or accidents that took place during the period of the Policy

5.10. Damage to property at the Site in the form of environmental contamination occurred during the period of the Policy.

5.11. Brooks Manufacturing's commercial general liability policies from 1971 to 1975 were issued by, among other companies, St. Paul Fire & Marine Insurance Company, Inc. ("St. Paul"). St. Paul is currently defending Brooks' Manufacturing under a reservation of rights. Each St. Paul policy has a $100,000 per occurrence limit for environmental property damage.

5.12. The St. Paul policies underlie the U.S. Fire Policy. Thus, property damage liability exceeding $100,000 is sufficient to trigger coverage under the U.S. Fire Policy.

5.13. Although Brooks Manufacturing will assert numerous defenses to liability, as one of only four PLPs, even a small percentage of liability means that Brooks Manufacturing's share of remediation expenses will easily exceed $100,000.

COMPLAINT FOR DECLARATORY JUDGMENT - 7
No.

GORDON TILDEN THOMAS CORDELL | 600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

## VI.  FIRST CAUSE OF ACTION:  DECLARATORY JUDGMENT

6.1. Brooks Manufacturing realleges the allegations of paragraphs 1.1 through 4.26 above.

6.2. An actual and substantial controversy presently exists between the parties regarding the existence and terms of the U.S. Fire umbrella liability policy DCL 726230.  U.S. Fire has refused to confirm the Policy's existence and terms.

6.3. U.S. Fire has also failed to satisfy its obligations under section 284-30-920 of the Washington Administrative Code.

6.4. The issuance of declaratory relied by this Court will terminate the existing controversy between the parties.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Brooks Manufacturing prays for the following relief:

7.1. A declaratory judgment that:

(a) U.S. Fire issued umbrella liability policy number DCL 726230 to Frank Brooks Manufacturing, effective July 15, 1971 to January 1, 1975.

(c) Brooks Manufacturing Company is the successor-in-interest to Frank Brooks Manufacturing.

(d) The Policy's terms and conditions are reflected in Form L4021J Rev 3 – 71, attached as **Exhibit B**.

(e) The Policy has a per occurrence limit of $2 million for property damage liability.

COMPLAINT FOR DECLARATORY JUDGMENT - 8
No.

GORDON TILDEN THOMAS CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

(f) The Policy is excess to the following policies issued by St. Paul Fire & Marine: 584 JA 4170 (7/15/1971 – 7/15/1972); 584 JA 4170 (7/15/1972 – 7/15/1973); 584 JA 4170 (7/15/1973 – 1/1/1975).

(g) U.S. Fire failed to satisfy its obligations under section 284-30-920 of the Washington Administrative Code.

(h) Brooks is entitled to all attorneys' fees and costs incurred in prosecuting this action pursuant to *Olympic Steamship Co., Inc. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991), and its progeny.

7.2 All further relief to which plaintiff may be entitled at law or in equity.

## VIII. JURY DEMAND

Brooks Manufacturing Company demands that this matter be heard before a jury on all issues so triable.

DATED this 10th day of July, 2019.

**GORDON TILDEN THOMAS & CORDELL LLP**
Attorneys for Plaintiff

By   s/ *Susannah Carr*
Susannah Carr, WSBA #38475
600 University Street, Suite 2915
Seattle, Washington 98101
206.467.6477
scarr@gordontilden.com

By   s/ *Miles C. Bludorn*
Miles C. Bludorn, WSBA #54238
600 University Street, Suite 2915
Seattle, Washington 98101
206.467.6477
mbludorn@gordontilden.com

# EXHIBIT A

| | | 08/06/71 | | KEENE |
|---|---|---|---|---|
| FRANK BROOKS MFG CO<br>P O BOX 7<br>BELLINGHAM WA 98225 | | ACCOUNT NO. | INVOICE NO. | ACCOUNTING I<br>BROOKS MF |
| | | 11363 | 24610 | |
| INSURED:<br>IF OTHER<br>THAN ABOVE | ET AL | POLICY EXPIRATION | ACCOUNT EXEC | |
| | | 07/15/74 | ~~140~~ 180 | |

COVERAGE: UMBRELLA LIABILITY

LOCATION

THIS BILLING COVERS PERIOD FROM: 07/15/71 TO: 07/15/72

035 | 1 | 99

| POLICY NO. | INSURANCE COMPANY | AMOUNT OR LIMIT OF LIABILITY | RATE | PREMIUM OR RETURN PREMIUM | CO. CODE | PAY TO CODE |
|---|---|---|---|---|---|---|
| OCL726230 | U S FIRE INS CO | | | 700.00 | 860 | 2400 |



Page 1

FRANK BR S MANUFACTURING CO
P O BOX 7
BELLINGHAM WA 98225

| ACCOUNT NO. | INVOICE NO. |
|---|---|
| 11363 | 36520 |
| POLICY EXPIRATION | ACCOUNT EXEC |
| 07/15/74 | 180 |

KEENE

ACCOUNTING INSU

F BROOKS MF

| C L A S S | D U R A T I O N | L O C A T I O N |
|---|---|---|
| 035 | 1 | 99 |

INSURED: IF OTHER THAN ABOVE

COVERAGE  UMBRELLA LIABILITY

LOCATION

R'd same #

THIS BILLING COVERS PERIOD FROM: 07/15/72  TO: 07/15/73

| POLICY NO. | INSURANCE COMPANY | AMOUNT OR LIMIT OF LIABILITY | RATE | PREMIUM OR RETURN PREMIUM | CO. CODE | PAY TO CODE |
|---|---|---|---|---|---|---|
| DCL726230 | U S FIRE | | | 887.00 | 860 | 2400 |

Page 2

| | | 05/10/73 | | KEENE |
|---|---|---|---|---|
| FRANK BROOKS MANUFACTURING CO<br>P O BOX 7<br>BELLINGHAM WA 98225 | | ACCOUNT NO | INVOICE NO. | ACCOUNTING INSU |
| | | 11363 | 47981 | F BROOKS MF |
| INSURED:<br>(IF OTHER<br>THAN ABOVE) | | POLICY EXPIRATION | ACCOUNT EXEC | |
| | | 07/15/74 | 180  C | C L A S S / D U R A T I O N / L O C A T I O N |

COVERAGE

UMBRELLA LIABILITY          YPI Exam A

LOCATION                                                            280  1  99

(policy extended to 1-1-75)

THIS BILLING COVERS PERIOD FROM: 07/15/73   TO: 07/15/74

| POLICY NO. | INSURANCE COMPANY | AMOUNT OR LIMIT OF LIABILITY | RATE | PREMIUM OR RETURN PREMIUM | CO. CODE | PAY TO CODE |
|---|---|---|---|---|---|---|
| DCL726230 | U S FIRE | | | 887.00 | 860 | 2400 |

Page 3

| | | | 08/24/73 | | KEENE | |
|---|---|---|---|---|---|---|
| FRANK BROOKS MANUFACTURING CO<br>P O BOX 7<br>BELLINGHAM WA 98225 | | | ACCOUNT NO. | INVOICE NO. | ACCOUNTING INS | |
| | | | 11363 | 51461 | F BROOKS M | |
| INSURED:<br>IF OTHER<br>THAN ABOVE | | | POLICY EXPIRATION | ACCOUNT EXEC. | | |
| | | | 07/15/74 | 180 | C L A S S | |

COVERAGE

GENERAL AND AUTO LIABILITY

LOCATION

THIS BILLING COVERS PERIOD FROM: 07/15/73  TO: 07/15/74 1-1-75

Lt Jack 4/4/W/
584 JS-1271
260  1  80

| POLICY NO. | INSURANCE COMPANY | AMOUNT OR LIMIT OF LIABILITY | RATE | PREMIUM OR RETURN PREMIUM | CO. CODE | PAY TO CODE |
|---|---|---|---|---|---|---|
| 584JA4170<br>584JA4170 | ST PAUL FIRE & MARINE | | | 711.00<br>596.00 | 762<br>762 | 6720<br>6720 |

| | | | 07/09/74 | | KEENE | |
|---|---|---|---|---|---|---|
| FRANK BROOKS MANUFACTURING CO<br>P O BOX 7<br>BELLINGHAM WA 98225 | | | ACCOUNT NO. | INVOICE NO | ACCOUNTING INS | |
| | | | 11363 | 61696 | F BROOKS MI | |
| INSURED:<br>IF OTHER<br>THAN ABOVE | | | POLICY EXPIRATION | ACCOUNT EXEC. | | |
| | | | 07/15/74 | 180-C | C L A S S | |

COVERAGE

UMBRELLA LIABILITY

LOCATION                EXTENDING POLICY

Centennial
462-01-32-07
280  1  99

THIS BILLING COVERS PERIOD FROM 07/15/74  TO: 01/01/75

| POLICY NO. | INSURANCE COMPANY | AMOUNT OR LIMIT OF LIABILITY | RATE | PREMIUM OR RETURN PREMIUM | CO. CODE | PAY TO CODE |
|---|---|---|---|---|---|---|
| DCL726230 | U S FIRE | | | 413.00 | 860 | 2400 |

# EXHIBIT B






**COMMERCIAL
COMPREHENSIVE
CATASTROPHE
LIABILITY
POLICY
(THE DEFENDER)
PROVISIONS
PART ONE**

## THE COMPANY NAMED ON THE DECLARATIONS PAGE

### NEW YORK, NEW YORK

(A capital stock company, herein called the company)

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statem< the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

*Insuring Agreements*

**I COVERAGE—**

The Company agrees to indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract:

(a) Personal Injury Liability. For damages, including damages for care and loss of services, because of personal injury, including death at any time resulting therefrom, sustained by any person or persons;

(b) Property Damage Liability. For damages because of injury to or destruction of tangible property including consequential loss resulting therefrom, caused by an occurrence;

c) Advertising Liability. For damages because of libel, slander, defamation, infringement of copyright, title or slogan, piracy, unfair competition, idea misappropriation or invasion of rights of privacy arising out of the named insured's advertising activities.

**II DEFENSE SETTLEMENT—**

With respect to any occurrence not covered by the underlying policies listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 4(C) of the declarations, the company shall:

(a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish any such bonds;

(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(d) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request;

and the amounts so incurred, except settlements of claims and suits are payable by the company in addition to the applicable limit of liability of this policy.

In jurisdictions where the company may be prevented by law or otherwise from carrying out this agreement, the company shall pay any expense incurred with its written consent in accordance with this agreement.

The insured shall promptly reimburse the company for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item 4(C) of the declarations.

**III DEFINITION OF "NAMED INSURED" AND "INSURED"—**

"Named insured", wherever used, includes any subsidiary company (including subsidiaries thereof) of the named insured and any other company coming under the named insured's control of which it assumes active management.

The unqualified word "insured", wherever used, includes the named insured and also:-

(a) any person, organization, trustee or estate to whom or to which the named insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or in behalf of the named insured or to facilities of or used by the named insured;

(b) any additional insured, other than the named insured, included in the lying policies listed in Schedule A but only to the extent that insura provided to such additional insured thereunder;

(c) except with respect to the ownership, maintenance or use, including or unloading, of automobiles while away from premises owned by, re or controlled by the named insured or the ways immediately adjoining aircraft, (1) any executive officer, other employee, director or stoc thereof while acting within the scope of his duties as such; (2) any orga or proprietor with respect to real estate management for the named

(d) any person while using an automobile or aircraft owned by or loaned named insured or hired for use in behalf of the named insured and any or organization legally responsible for the use thereof, provided the use of the automobile or aircraft is by the named insured or with the insured's permission, and any executive officer, director or stockhol the named insured with respect to the use of an automobile or aircr owned by the named insured in the business of the named insured. Th< ance with respect to any person or organization other than the named does not apply under division (d) of this insuring agreement:

1. to any person or organization, or to any agent or employee thereof, or an automobile sales agency, repair shop, service station, storage or public parking place, with respect to any occurrence arising out operation thereof;

2. with respect to any automobile or aircraft hired by or loaned to the insured, to the owner or a lessee thereof other than the named insu to any agent or employee of such owner or lessee;

3. to any manufacturer of aircraft, aircraft engines or aviation acces or any aviation sales or service or repair organization or airport or operator or their, respective employees or agents, with respect to currence arising out of the operation thereof.

**IV POLICY PERIOD, TERRITORY—**

This policy applies only to occurrences happening anywhere during the period.

**V RETAINED LIMIT—LIMIT OF LIABILITY—**

With respect to Coverage I (a), I (b) or I (c), or any combination there company's liability shall be only for the ultimate net loss in excess of the in retained limit defined as the greater of:

(a) the total of the applicable limits of the underlying policies listed in S< A hereof, and the applicable limits of any other underlying insuran lectible by the insured; or

(b) an amount as stated in Item 4(C) of the declarations as the result of a occurrence not covered by the said policies or insurance;

and then up to an amount not exceeding the amount as stated in Item 4(A) declarations as the result of any one occurrence. There is no limit to the of occurrences during the policy period for which claims may be made, that the liability of the company arising out of the products hazard on acc all occurrences during each policy year shall not exceed the aggregate stated in Item 4(B) of the declarations.

In the event of the reduction or exhaustion of the aggregate limits of of the underlying policies listed in Schedule A by reason of losses paid ther this policy, subject to the above limitations, (1) in the event of reductio< pay the excess of the reduced underlying limits; or (2) in the event of exh shall continue in force as underlying insurance.

(2)

Insert Declarations page (Part Two) and Endorsements here so that left edge butts against fold of Contract, and permits policy number to appear through window.

## Exclusions

's policy shall not apply:

under Coverage I (a), to any obligation for which the insured or any of its insurers may be held liable under any workmen's or unemployment compensation, disability benefits or similar law, provided, however, that this exclusion does not apply to liability of others assumed by the named insured under contract;

(b) under Coverage I (b), to injury to or destruction of (1) property owned by the insured or (2) any goods, products or containers thereof manufactured, sold, handled or distributed, or work completed by or for the insured, out of which the occurrence arises; or (3) property rented to, occupied or used by or in the care, custody or control of the insured to the extent the insured is under contract to provide insurance therefor;

(c) under Coverage I (c), to liability for (1) failure of performance of written contract, (2) infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans, (3) incorrect description of any article or commodity, or (4) mistake in advertised price;

(d) under Coverage I (a) and I (b), to injury, sickness, disease, death or destruction
1. with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
2. resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

(e) under Coverage I (a) and I (b), to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if
1. the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;
2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
3. the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to injury to or destruction of property at such nuclear facility;

(f) as used in this policy:
"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear material" means source material, special nuclear material or byproduct material;
"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material (1) containing byproduct material and (2) re ing from the operation by any person or organization of any nuclear facility cluded within the definition of nuclear facility under paragraph (1) or (2) there
"nuclear facility" means
1. any nuclear reactor,
2. any equipment or device designed or used for (a) separating the isol of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) han processing or packaging waste,
3. any equipment or device used for processing, fabricating or alloyin special nuclear material if at any time the total amount of such mater the custody of the insured at the premises where such equipment or d is located consists of or contains more than 25 grams of plutoni: uranium 233 or any combination thereof, or more than 250 gram uranium 235,
4. any structure, basin, excavation, premises or place prepared or use the storage or disposal of waste, and includes the site on which any o foregoing is located, all operations conducted on such site and all pre used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fi in self-supporting chain reaction or to contain a critical mass of fissionabl( terial;

With respect to injury to or destruction of property, the word "injur) "destruction" includes all forms of radioactive contamination of property;

(g) under Coverage I (b), to claims made against the insured
1. for repairing or replacing any defective product or products manufact sold or supplied by the insured or any defective part or parts thereo for the cost of such repair or replacement;
2. for the loss of use of any such defective product or products or pa parts thereof;
3. for improper or inadequate performance, design or specification; but n herein contained shall be construed to exclude claims made against t sured for personal injuries or property damage (other than damage product of the insured) resulting from improper or inadequate perform design or specification;

(h) under Coverage I (a) and I (b), except with respect to occurrences taking in the United States of America, its territories or possessions, or Canad any liability of the insured directly or indirectly occasioned by, happ through or in consequence of war, invasion, acts of foreign enemies, hosti (whether war be declared or not), civil war, rebellion, revolution, insurre military or usurped power or confiscation or nationalization or requisiti destruction of or damage to property by or under the order of any goverr or public or local authority;

(i) except insofar as coverage is available to the insured in the underlying ance as set out in Schedule A of the policy, this policy shall not apply Coverage I (a) and I (b), to liability arising out of the ownership, mainten operation, use, loading or unloading of aircraft owned by the insure chartered on behalf of the insured without crew, but this exclusion shal apply to liability for personal injury to any employee of the insured arism of and in the course of his employment by the insured.

## Conditions

**A. Premium Computation.** The premium for this policy shall be based upon the rating basis as set forth in the declarations during the policy period, and shall be computed at the rate set forth in the declarations applied to each unit exposure of such rating basis. The advance premium is based upon the estimated exposures for the policy period as stated in the declarations.

Upon expiration of this policy or its termination during the policy period, the earned premium shall be computed as thus defined. If the earned premium thus computed is more than the advance premium paid, the named insured shall immediately pay the excess to the company; if less, the company shall return the difference to the named insured; but the company shall receive and retain the annual minimum premium for each twelve (12) months of the policy period.

**B. Inspection and Audit.** The company shall be permitted at all reasonable times to inspect the insured's premises and equipment, and to examine the named insured's books and records, so far as the books and records relate to premium earned or to any occurrences happening during the policy period.

**C. Severability of Interests.** The term "insured" is used severally and not collectively except with respect to Insuring Agreement V (Retained Limit—Limit of Liability) and Condition J (Other Insurance). The inclusion in this policy of more than one insured shall not operate to increase the company's total liability for all insureds covered by this policy beyond the limits set forth in Item 4 (A) and 4 (B) of the declarations.

**D. Other Definitions.** (a) "Personal injury" means (1) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury; (2) false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation; (3) libel, slander, defamation of character or invasion of rights of privacy, unless arising out of any advertising activities; (4) discrimination not committed by or at the direction of the insured; and (5) assault and battery not committed by or at the direction of the insured, unless committed for the purpose

of preventing or eliminating danger in the operation of aircraft or for the pu of protecting the property of the insured or the person or property of others.
(b) "Ultimate net loss" means the total of the following sums with respe each occurrence;
(1) All sums which the insured, or any company as his insurer, or become legally obligated to pay as damages, whether by reaso adjudication or settlement, because of personal injury, property dama advertising liability to which this policy applies, and
(2) All expenses incurred by the insured in the investigation, negotiation, s ment and defense of any claim or suit seeking such damages, excl only the salaries of the insured's regular employees, provided "ult net loss" shall not include any damages or expense because of lu excluded by this policy.

This policy shall not apply to defense, investigation, settlement or expenses covered by underlying insurance.
(c) "Products hazard" means (1) the handling or use of or the existence o condition in or a warranty of goods or products manufactured, sold, handled d tributed by the named insured or by others trading under its name, if the o rence happens after possession of such goods or products has been relinqu to others by the named insured or by others trading under its name and if occurrence happens away from premises owned by, rented to or controlled b named insured; provided, such goods or products shall be deemed to includ container thereof, other than a vehicle, but shall not include any vending ma or any property, other than such container rented to or located for use of t but not sold; or (2) operations, if the occurrence happens away from premises own rented to or controlled by the named insured; provided operations shall n deemed incomplete because improperly or defectively performed or be further operations may be required pursuant to an agreement; provided fu

(3)

the following shall not be deemed to be "operations" within the meaning of this paragraph: (aa) pick-up or delivery, except from or onto a railroad car, (bb) the maintenance of vehicles owned or used by or in behalf of the insured, (cc) the existence of tools, uninstalled equipment and abandoned or unused materials.

(d) Occurrence. With respect to Coverage I (a) and I (b) "occurrence" means either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

With respect to Coverage I (c), all damages involving the same injurious material or act, regardless of the frequency of repetition thereof, the number or kind of media used, and the number of claimants shall be deemed to arise out of one "occurrence".

**E. Notice of Occurrence.** Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the insured and the fullest information obtainable at the time.

The insured shall give like notice of any claim made on account of such occurrence. If legal proceedings are begun the insured, when requested by the company, shall forward to it each paper thereon, or a copy thereof, received by the insured or the insured's representatives, together with copies of reports of investigations made by the insured with respect to such claim proceedings.

**F. Assistance and Co-operation.** Except as provided in Insuring Agreement II (Defense, Settlement) or in Insuring Agreement V (Retained Limit—Limit of Liability) with respect to the exhaustion of the aggregate limits of underlying policies listed in Schedule A, or in Condition K (Underlying Insurance) the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

**G. Appeals.** In the event the insured or the insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, the company may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of the company for ultimate net loss exceed the amount set forth in Insuring Agreement V (Retained Limit—Limit of Liability) for any one occurrence plus the taxable costs, disbursements and interest incidental to such appeal.

**H. Loss Payable.** Liability of the company with respect to any one occurrence shall not attach unless and until the insured, the insured in behalf of the insured, or the insured's underlying insurer, has paid the amount of retained limit. Insured shall make a definite claim for any loss for which the company may liable within twelve (12) months after the insured shall have paid an amount of ultimate net loss in excess of the amount borne by the insured or after the insured's liability shall have been made certain by final judgment against the insured after actual trial, or by written agreement of the insured, the claimant, and the company. If any subsequent payments are made by the insured on account of the same occurrence, additional claims shall be made similarly from time to time and shall be payable within thirty (30) days after proof in conformity with this policy.

**I. Bankruptcy or Insolvency.** Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder.

**J. Other Insurance.** If other collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder) the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If the insured carries other insurance with the company covering a loss also covered by this policy (other than underlying insurance of which the insurance afforded by this policy is in excess) the insured must elect which policy shall apply and the company shall be liable under the policy so elected and shall not be liable under any other policy.

**K. Underlying Insurance.** If underlying insurance is exhausted by any occurrence the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

**L. Subrogation.** The company shall be subrogated to the extent of any payment hereunder to all the insured's rights of recovery therefor; and the insured shall do everything necessary to secure such rights. Any amount so recovered shall apportioned as follows:

Any interest (including the insured's) having paid an amount in excess of retained limit plus the limit of liability hereunder shall be reimbursed first the extent of actual payment. The company shall be reimbursed next to extent of its actual payment hereunder. If any balance then remains unpaid shall be applied to reimburse the insured or any underlying insurer, as their interests may appear. The expenses of all such recovery proceedings shall be portioned in the ratio of respective recoveries. If there is no recovery in ceedings conducted solely by the company, it shall bear the expenses thereof

**M. Changes.** Notice to or knowledge of any agent or other person shall effect a waiver or change in any part of this policy nor estop the company asserting any right under it, nor shall the terms of this policy be waived changed except by endorsement hereon.

**N. Assignment.** Assignment of interest under this policy shall not bind the pany until its consent is endorsed hereon. If, however, the insured shall die be adjudged bankrupt or insolvent within the policy period, this policy, un canceled, shall cover the insured's legal representative for the unexpired portion of such period.

**O. Cancelation.** This policy may be canceled by the named insured by surrender thereof to the company or any of its authorized agents, or by mailing to the company written notice stating when thereafter such cancelation shall be effective. policy may be canceled by the company by mailing to the named insured at address shown in this policy written notice stating when, not less than thirty days thereafter, such cancelation shall be effective. The mailing of notice aforesaid shall be sufficient notice and the effective date of cancelation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent mailing. If the named insured cancels, earned premium shall be computed accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata.

Premium adjustment may be made at the time cancelation is effected or soon as practicable thereafter. The check of the company or its representative mailed or delivered, shall be sufficient tender of any refund due the named insured.

If this policy insures more than one named insured, cancelation may be effected by the first of such named insureds for the account of all insureds; and notice of cancelation by the company to such first named insured shall be notice to insureds. Payment of any unearned premium to such first named insured shall for the account of all interests therein.

**P. Maintenance of Underlying Insurance.** It is warranted by the insured that underlying policies listed in Schedule A, or renewals or replacements thereof more restricted, shall be maintained in force during the currency of this policy except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences happening during the policy period. the event of failure by the insured so to maintain such policies in force or to m all conditions and warranties subsequent to loss under such policies, the insurance afforded by this policy shall apply in the same manner it would have applied such policies been so maintained in force. Notice of exhaustion of underlying insurance shall be given the company within 30 days of such exhaustion.

IN WITNESS WHEREOF, the company has caused this policy to be signed by its president and secretary but this policy shall not be valid unless completed by attachment hereto of a declarations page designated as Part Two and countersigned on the aforesaid declarations page by a duly authorized representative of company.

*George R Cross*, Secretary

*B. P. Russell*, President

Form L4021J Rev. 3-71